UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| JEFFREY ANDREW BLOSS, | Case No. 1:15-cv-00467-BLW |
|---|---|
| Plaintiff, | MEMORANDUM DECISION AND ORDER |
| v. | |
| TWIN FALLS COUNTY, TOM CARTER, AND DOES I-X, | |
| Defendants. | |

# INTRODUCTION

Plaintiff Jeffrey Andrew Bloss, an Idaho state prisoner, filed this civil rights action pursuant to 42 U.S.C. § 1983 and state tort law, alleging deliberate indifference to his serious medical needs. Plaintiff is proceeding *pro se*. Currently pending before the Court is Defendants' Motion for Summary Judgment (Dkt. 37) and Motion to Seal (Dkt. 38). For the reasons explained below, the Court will grant both Motions in full.

# BACKGROUND

1. **Factual Background**

   A. *Plaintiff's Injury and Medical Treatment*

   While in the custody of Twin Falls County Adult Detention Facility ("County Jail") on October 3, 2013, Plaintiff injured his left knee in an altercation with another detainee. *Kane Aff.*, *Ex. B* at 39–43, Dkt. 39-4. On the same day, immediately following the altercation, Plaintiff was placed in a wheelchair and taken to St. Luke's Quick Care.

*Id.* At St. Luke's, the clinic personnel took x-rays of his left knee and examined him. The clinic noted swelling, but no "acute injuries." *Id.* The clinic prescribed ibuprofen and an icing regimen. The clinic also advised if there was no improvement in two to three weeks to schedule a follow up visit for a possible MRI. *Kane Aff., Ex. A* at 1522, Dkt. 39-4. Following the clinic visit, the Plaintiff returned to the County Jail and healthcare personnel at the jail followed the medical directions provided. *See Ippolito Aff.* ¶ 3–4, Dkt. 39-2; *Probasco Aff.* ¶ 5, Dkt. 37-3.

On October 7, 2013, Plaintiff complained of a "fluttering feeling" in his ankle and was transported to St. Luke's Magic Valley Regional Medical Center Emergency Department that same day. *Hughes Aff., Ex. A* at 290–92, Dkts. 37-5, 39. Plaintiff was diagnosed with a hamstring strain. *Id.* He was given a hamstring stretch pamphlet along with direction to continue taking ibuprofen. *Id.* In addition, the clinic prescribed him a muscle relaxer and to take it every six hours. *Id.*

On October 10, Plaintiff filed three separate grievances through services available at the County Jail,[1] all alleging intense pain and requesting pain medication, an MRI, and surgery. *Hughes Aff., Ex. A* at 285, 288–89, Dkt. 39. The following day, Corle, a jail nurse, examined Plaintiff. Under the supervision of Dr. Ippolito, she informed Plaintiff that a nerve conduction study may be necessary, but would not be effective until three to

---

[1] "Inmate grievances regarding health care issues will be investigated by an uninvolved member of the medical staff. . . The inmate should be provided with a written response in accordance with the schedule set forth in the Inmate Grievances Policy. Responses to inmate grievances should be based on the community standard of health care." *Carter Aff.*, Ex. A. at 999.

four weeks after the injury occurred. In addition, Corle advised Plaintiff not to limit his activity. *Hughes Aff.*, *Ex. A* at 284, 286-87, Dkt. 39.

The next day, October 12, Plaintiff submitted another grievance demanding an MRI and a doctor's written recommendation advising him to walk on his injury. *Hughes Aff.*, *Ex. A* at 283, Dkt. 39. On October 15, Plaintiff was seen by jail nurse, Lou Probasco. At that appointment, Probasco told Plaintiff that an orthopedic appointment would be scheduled. *Hughes Aff.*, *Ex. A* at 282, Dkt. 39

On October 17, Plaintiff filed two more grievances stating that his leg was not working, and again, requested pain medication, an MRI, and surgery. *Hughes Aff.*, *Ex. A* at 278-79, Dkt. 39. Plaintiff saw Probasco the next day, at which time Probasco told Plaintiff that he was to continue ibuprofen and that he would arrange a nerve conduction study and neurology consult. *Id.* at 277.

Ippolito evaluated Plaintiff on October 25, prescribed him Motrin, and planned to re-evaluate him the following week. In addition, Ippolito planned to schedule a nerve conduction survey if there was no improvement. *Hughes Aff.*, *Ex. A* at 263–64. At Plaintiff's October 31 appointment, Ippolito scheduled the nerve conduction survey for November 19. *Id.* at 262. Ippolito re-evaluated Plaintiff on November 1 and planned to check in with him following his nerve conduction survey. *Id.* at 252.

Plaintiff filed two more grievances on November 8 and 10 complaining about leg and foot pain. He said that he needed to see a specialist and needed quicker care. *Hughes*

*Aff.*, *Ex. A* at 256-57. In response, Probasco evaluated Plaintiff on November 12 and prescribed ibuprofen until Plaintiff's November 19 appointment. *Id.* at 254.

Following the Plaintiff's nerve conduction survey, Plaintiff saw Ippolito who, after discussing the results with Dr. Steffens, discussed the possible avulsion of the peroneal nerve. Ippolito scheduled an MRI for December 3 and a neurology consult on December 10, 2014. *Hughes Aff.*, *Ex. A* at 205, 237, 248.

On November 26, 2013, the day before Plaintiff was transferred to the Idaho State Correctional Institution, Probasco provided a *Medical Request for Payment Authorization* form requesting medical visits for Plaintiff's MRI and follow up with a neurologist. In addition, it requested Plaintiff be provided with ibuprofen. *Hughes Aff.*, *Ex. A* at 227. On December 6, Ippolito noted that Probasco had informed the Correctional Institution of Plaintiff's scheduled MRI and neurologist consult through the *Medical Request for Payment Authorization* form. However, Ippolito indicates that the Correctional Institution "elected to take him to the Correctional Institute and follow up in their setting and not have it done [at the County Jail]." *Id.* at 208. It is unclear whether the Correctional Institution kept or rescheduled his appointments.

On November 29, 2013, Dr. Friedman performed an independent medical examination of Plaintiff. After reviewing and discussing Plaintiff's medical records, history, and symptoms, Friedman concluded that Twin Falls County had provided him with appropriate medical care and treatment during his detention. *Friedman Aff.* ¶ 4, Dkt. 39-1. Friedman's report indicates that Plaintiff suffers from permanent nerve damage that

limits the movement in his lower leg and left foot. *Friedman Aff.* at 9, Dkt. 39-1. As a result of this nerve damage, Plaintiff must now use an Ankle-Foot Orthosis to improve gait function and stability. *Id.* Friedman concluded that Plaintiff will "always have a foot drop, with numbness" as a result of his October 3 knee injury. *Id.* at 10. However, Friedman's report also indicated that he believed that the nerve damage may have resulted, in part, from a previous car accident unrelated to the October 3 incident. *Id.* at 9.

### B. *Twin Falls County Jail Medical Structure*

The County hires independent Idaho licensed medical doctors and nurses to provide county inmates healthcare services. These independent contractors are required to comply with Idaho law, the Rules of Idaho State Board of Medicine, and the Board of Nursing, which set up licensing criteria and handle any disciplinary matters. *Hughes Aff.* ¶ 5. Twin Falls does not have its own training program for medical personnel. *Probasco Aff.* ¶ 3.

In addition, the jail deputies are not tasked with providing any healthcare to inmates. A jail deputy receives medical requests and grievances, which are passed on to medical personnel. *See Hughes Aff.* ¶ 6; *Carter Aff.*, Ex. A. at 999.

The Twin Falls County Sheriff's Office Custodial Manual describes the medical procedures for the County Jail. Licensed nurses handle all of the medically proscribed activity mentioned in the manual. *Carter Aff., Ex.* A. The manual details how staff

should handle grievances and communication between staff, but not any specific medical treatment. *Carter Aff.*, *Ex.* A

## LEGAL STANDARD

**1.     Standard of Law for Summary Judgment**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). There must be a genuine dispute as to any *material* fact—a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt

unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

# ANALYSIS

1. **§ 1983 Claims**

    A. *Claims Against Sheriff Carter*

    Plaintiff alleges that Sheriff Carter was deliberately indifferent to Plaintiff's serious medical needs and failed to properly train or supervise the staff responsible for his healthcare in violation of his constitutional rights. Defendant Carter alleges that he was not deliberately indifferent towards Plaintiff's medical needs, and, in any event, was entitled to qualified immunity. Because the Court finds that no constitutional violation occurred, the Court will grant defendants' Motion for Summary Judgment for claims against Carter and need not proceed to assess whether Carter was entitled to qualified immunity.

    (1) **Deliberate Indifference**

    The Eighth Amendment of the United States Constitution protects prisoners against cruel and unusual punishment while incarcerated. To state a claim under the Eighth Amendment, a plaintiff must show that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he was deprived of the "minimal civilized measure of life's necessities as a result of the defendant's actions." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference."

*Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

The Ninth Circuit employs a two-part test for deliberate indifference. "First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant[s'] response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012).

As for the first prong, the Ninth Circuit has stated three different ways in which a medical need is serious: "[1] [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; [2] the presence of a medical condition that significantly affects an individual's daily activities; [3] or the existence of chronic and substantial pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller,* 104 F.3d 113 (9th Cir. 1997).

As for the second prong, a prison official is deliberately indifferent only if the official "knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. Of Washoe, Nev.* 290 F.3d 1175, 1187 (9th Cir. 2002). In a medical context, deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

Notwithstanding the seriousness of his medical condition, Plaintiff has failed to meet his burden of coming forward with sufficient facts to show that Defendant Carter violated his Eighth Amendment rights. Plaintiff's filings lack any allegations as to Carter's role in the underlying events. Conspicuously missing from the Complaint or response to the Motion for Summary Judgment are any facts suggesting that Carter knew about Plaintiff's condition or was otherwise involved in the subsequent treatment decisions. Moreover, there has been no showing as to his deliberate indifference. Defendants, in contrast, assert that Sheriff Carter did not engage with Plaintiff on a day-to-day basis and did not handle any of the grievances Plaintiff made. *Carter Aff.* ¶ 4, Dkt. 37-4.

The fact that Plaintiff received substantial and prompt medical care also undercuts his claim of deliberate indifference. The County Jail staff promptly transported Plaintiff to St. Luke's on the day of his injury, where he received x-rays and ibuprofen. Jail healthcare personnel saw him at least eleven times from the date of his injury through the remainder of his detention, which was a little less than two months. The medical staff provided him with ibuprofen whenever he would complain of pain. At least one medical professional concluded, after reviewing Plaintiff's medical records and conducting an independent medical examination, that he had received adequate health care. Plaintiff also provides no evidence to suggest that any delays in his treatment were deliberate or unreasonable.

On this sparse record, no reasonable jury could find that Carter was deliberately indifferent to Plaintiff's medical needs. Because no constitutional violation occurred, the Court will grant defendants' Motion for Summary Judgment on Carter's deliberate indifference claim and need not proceed to assess whether Carter was entitled to qualified immunity.

### (2) Failure to Train or Supervise

To establish a § 1983 claim for failure to supervise or train, a plaintiff must show that: (1) he was deprived of a constitutional right; (2) the supervisor either failed to supervise or train the subordinate official; (3) the training deficiency is "closely related" to the violation of plaintiff's constitutional right; and (4) the failure to train "amounts to deliberate indifference to the rights of persons" with whom those officials are likely to interact. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014).

As stated above, Plaintiff's bare allegations are insufficient to establish a violation of his constitutional rights. Without an underlying constitutional violation, Plaintiff cannot prevail on his claim that Carter inadequately trained or supervised jail staff. *See Long v. City & Cty. of Honolulu*, 511 F.3d 901, 907 (9th Cir. 2007) ("If there was no constitutional violation of Long's rights, there is 'no basis for finding the officers inadequately trained.'") (quoting *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994).

Accordingly, the Court must grant defendants' Motion for Summary Judgment on Carter's failure-to-train or supervise claim and need not proceed to assess whether Carter was entitled to qualified immunity.

### B. *Claims against Twin Falls County*

Plaintiff also alleges a *Monell* claim against Defendant, Twin Falls County, stating that the County had "an official policy or custom of deliberate indifferent [sic] to its detainees' serious health and medical needs. . . and failure to properly train or supervise defendants deputy sheriffs engaging in such constitutional violations."

Municipalities can only be held liable under 42 U.S.C. § 1983 for "constitutional deprivations visited pursuant to governmental custom." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). To establish his *Monell* claim, Plaintiff must prove four elements: (1) that he was deprived of a constitutional right, (2) that the County had a policy or custom, (3) that the policy amounted to deliberate indifference of a constitutional violation, and (4) the policy was the "moving force behind the constitutional violation." *Mabe v. San Bernardino Cty.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001). A municipality may also be held liable on a "failure to train" theory under the same standard applicable to supervisors in their individual capacity. *See City of Canton*, 489 U.S. at 388; *Flores*, 758 F.3d at 1159.

For the reasons stated above, Plaintiff has failed to establish that he was deprived of any constitutional right. Accordingly, Plaintiff cannot prevail on his claims against Twin Falls County, which are "contingent on a violation of constitutional rights." *Scott v.*

*Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) ("[T]he municipal defendants cannot be held liable because no constitutional violation occurred.") The Court will grant Defendants' Motion for Summary Judgment as to all § 1983 claims.

2.  **Idaho Tort Claims Act**

Plaintiff alleges Idaho state tort claims similar to those raised in his § 1983 claims. He alleges that Carter and Twin Falls County were deliberately indifferent to his medical needs and that both defendants failed to train and/or supervise their employees.

The Idaho Tort Claims Act (ITCA) "establishes that governmental entities are subject to liability for their own negligent or wrongful acts, and those of their employees who were acting within the course and scope of their employment." *Hoffer v. City of Boise*, 257 P.3d 1226, 1228 (Idaho 2011). However, the ITCA also expressly exempts certain causes of action. *Id.* Idaho Code § 6-904B states, "[a] governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent and without gross negligence or reckless, willful and wanton conduct as defined in section 6-904C, Idaho Code, shall not be liable for any claim which: [5] Arises out of any act or omission providing or failing to provide medical care to a prisoner or person in the custody of any city, county or state jail, detention center or correctional facility."

Here, Plaintiff has not established any facts which suggest that the Defendants' conduct rose to the level of "gross negligence," or "reckless, willful and wanton" as those terms are defined under Idaho law. "'Reckless, willful and wanton conduct' is present

only when a person intentionally and knowingly does or fails to do an act creating unreasonable risk of harm to another, and which involves a high degree of probability that such harm will result." Idaho Code § 6-904C(2). The standard requires the court to find that "[t]he specific harm . . . [is] manifest or ostensible, and highly likely to occur." *Hunter v. Dep't of Corrections*, 57 P.3d 755, 761 (Idaho 2002) (first and second alterations in original). Plaintiff has not alleged any specific harm that was highly likely to occur because of Defendants' conduct. Indeed, it is undisputed that the jail's medical staff saw to Plaintiff's medical needs at least eleven times from the date of his injury through the remainder of his detention, which was a little less than two months.

Likewise, Defendants' conduct does not rise to the level of "gross negligence" under Idaho Code. Gross negligence requires a "duty to do or not do such act and that failing that duty shows deliberate indifference to the harmful consequences to others." Idaho Code § 6-904C(1). As discussed previously, there are no facts to indicate that Defendants' conduct rose to the level of deliberate indifference. Therefore, the Court grants Defendants' Motion for Summary Judgment on the state law claims.

3. **Unnamed Defendants**

Plaintiff also sues unnamed defendants, Does I–X. For the same reasons above, there are no facts to indicate any constitutional violations by these defendants. Therefore, the Court grants summary judgment to the unnamed individuals.

### 4. Motion to Seal

Defendants also filed a Motion to Seal (Dkt. 38) certain exhibits accompanying their Motion for Summary Judgment. These include Exhibit A to the Affidavit of Douglas Hughes; the Affidavit of Michael Kane, with exhibits; the Affidavit of Robert Friedman (medical doctor), with exhibits; and the Affidavit of Joseph Ippolito (medical doctor), with exhibit. Defendants move to seal these affidavits and exhibits because they contain sensitive information related to Plaintiff's medical history, treatment, and diagnosis. Plaintiff does not oppose the motion.

Due to the general common law "right to inspect and copy public records and documents, including judicial records and documents," there is a "strong presumption" in favor of access to judicial proceedings and records. *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178–80 (9th Cir. 2006). Accordingly, a party seeking to seal documents supporting a dispositive motion has the burden of demonstrating "compelling reasons" that outweigh the "public interest in understanding the public process." *Id.*

Courts have routinely recognized the sensitive and confidential nature of medical records as a "compelling reason" for their sealing. *See, e.g., A.C. v. City of Santa Clara*, No. 13-CV-03276-HSG, 2015 WL 4076364, at *2 (N.D. Cal. July 2, 2015); *Williams v. Nevada Dep't of Corr.*, No. 2:13-CV-941-JAD-VCF, 2014 WL 3734287, at *1 (D. Nev. July 29, 2014)*; San Ramon Regional Med. Ctr., Inc. v. Principal Life Ins. Co.*, No. C 10-02258 SBA, 2011 WL 89931, at *1, n.1 (N.D. Cal. Jan. 10, 2011); *Wilkins v. Ahern*, No. C 08-1084 MMC PR, 2010 WL 3755654, at *4 (N.D. Cal. Sept. 24, 2010); *Abbey v.*

*Hawaii Employers Mut. Ins. Co.*, No. CIV. 09-000545 SOM, 2010 WL 4715793, at *1–2 (D. Haw. Nov. 15, 2010); *Lombardi v. TriWest Healthcare Alliance Corp.*, No. CV-08-02381-PHX-FJM, 2009 WL 1212170, at *1 (D. Ariz. May 4, 2009).

Moreover, no less restrictive alternative to sealing is available here, as this medical information is pertinent to the pending motion and cannot be redacted. Thus, although the medical records are directly related to the merits of the case, the Court finds that the sensitive nature of these documents outweigh the presumption in favor of public access to court records. Accordingly, the Court will grant Defendants' Motion to seal.

## ORDER

**IT IS ORDERED:**

1. Defendants' Motion for Summary Judgment (Dkt. 37) is **GRANTED**.

2. Defendants' Motion to Seal (Dkt. 38) is **GRANTED**. The documents lodged under Dkt. 39 shall remain **UNDER SEAL** until further order of this Court.

3. The Court will enter a separate judgment in accordance with Fed. R. Civ. P. 58.

DATED: August 24, 2017

_____
B. Lynn Winmill
Chief Judge
United States District Court